IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 04-00611-04 |
| | : | |
| STEVEN VAUGHN | : | |

THE UNITED STATES' MEMORANDUM
IN SUPPORT OF THE
DEFENDANT'S CHANGE OF PLEA

The United States of America respectfully submits this memorandum in support

of the proposed change of plea of defendant STEVEN VAUGHN ("VAUGHN"), which the

Court has scheduled for April 7, 2005.

I. SUMMARY OF THE OFFENSE

On September 29, 2004, a grand jury sitting in the Eastern District of

Pennsylvania returned a 48 count indictment against seven defendants, including VAUGHN.

Count Three of the indictment charged VAUGHN along with co-defendants SHAMSUD-DIN

ALI and JOHN CHRISTMAS, with conspiracy to commit mail fraud, in violation of 18 U.S.C. §

371 and § 1341.  Counts Four, Five and Six charged VAUGHN, SHAMSUD-DIN ALI and

CHRISTMAS with substantive mail fraud, in violation of § 1341.  The grand jury returned a

superseding indictment on February 2, 2005, charging VAUGHN with the same offenses.

Counts One and Two of the superseding indictment charge SHAMSUD-DIN ALI

and FARIDAH ALI with racketeering and racketeering conspiracy, in violation of 18 U.S.C. §§

1962(c) and 1962(d).  The superseding indictment avers that from January 1998 through October

2003, SHAMSUD-DIN ALI and FARIDAH ALI operated a racketeering enterprise that engaged

in a pattern of criminal acts to generate illegal proceeds for the ALIs, including mail fraud, wire

fraud, bank fraud, extortion, commercial bribery under state law, and interstate travel in aid of racketeering.  The racketeering enterprise consisted of SHAMSUD-DIN ALI, FARIDAH ALI, the Sister Clara Muhammad School, a private school operate by the ALIs, a corporate entity owned by the ALIs known as Keystone Information & Financial Services, Inc. ("KIFS"), and a second corporate entity known as Hi-Technology Recycling Waste Management, Inc..

SHAMSUD-DIN ALI used KIFS to carry out several of the criminal schemes of the racketeering enterprise.   Racketeering Act One of Count One charges that SHAMSUD-DIN ALI used KIFS to conduct a scheme to defraud the City of Philadelphia and its citizens by falsely representing that KIFS had performed professional debt collection services on behalf of the City of Philadelphia Law Department in connection with the payment of delinquent real estate taxes owed to the City.  See Superseding Indictment, Count One, Racketeering Act Once, ¶¶ 26-72, at 9-27.

Counts Three through Six, in which VAUGHN is charged, aver the same scheme to defraud the City of Philadelphia set forth in Racketeering Act One.

## II. ELEMENTS OF THE OFFENSE

The elements of conspiracy under 18 U.S.C. § 371 are:

1.    An agreement or understanding by two or more persons, was existing at or about the time charged in the indictment;

2.    The defendant knew of the purpose of the conspiracy and deliberately joined it; and

3.    After the conspiracy came into existence, at least one of the conspirators knowingly performed at least one of the overt act to advance the purpose of the conspiracy, agreement, or understanding.

2

See United States v. Helbling, 209 F.3d 226, 238 (3d Cir. 2000); United States v. Mastrangelo,

172 F.3d 288, 291 (3d Cir. 1999); United States v. Conley, 37 F.3d 970, 976 (3d Cir. 1994).

Section 1341 of Title 18 of the United States Code provides, in part, that:

> Whoever, having devised any scheme or artifice to defraud, or for
> obtaining money or property by means of false or fraudulent
> pretenses, representations, or promises, . . . and for the purpose of
> executing such scheme or artifice or attempting so to do, places in
> an . . . authorized depository for mail matter, any matter or thing
> whatever to be sent or delivered by the Postal  Service or any
> private or commercial interstate carrier..... shall be guilty of a
> crime against the United States.

The government must prove three essential elements to establish a mail fraud

offense:

1. The defendant knowingly devised or participated in
a scheme to defraud or to obtain money or property
by materially false or fraudulent pretenses,
representations or promises;

2. The defendant acted with the specific intent to
defraud; and

3. In advancing, furthering, or carrying out the
scheme, the defendant used or caused the mails to
be used.

See United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002); United States v. Frey, 42 F.3d

795, 797 (3d Cir. 1994); United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994); United

States v. Copple, 24 F.2d 535, 544 (3d Cir. 1994); United States v. Pearlstein, 576 F.2d 531, 534

(3d Cir. 1978).

## III. THE GUILTY PLEA AGREEMENT

The defendant and his counsel of record have executed a Guilty Plea Agreement

with the government.  (A copy of the Guilty Plea Agreement is attached as Exhibit 1.)  The essential terms of the Guilty Plea Agreement are summarized below.

The defendant has agreed to plead guilty to the conspiracy offense charged in Count Three, and the mail fraud offense charged in Count Four.   The government has agreed to dismiss Counts Five and Six at sentencing.  The defendant has agreed to pay a special assessment in the amount of $200, and agrees to pay any fine or restitution ordered by the Court.

The parties have entered the following stipulations for the purpose the Sentencing Guidelines effective November 1, 2001:

1.   The parties agree and stipulate that the applicable sentencing guideline is U.S.S.G. § 2B1.1(a), and that the base offense level is level 6.

2.   The parties agree and stipulate that the defendant's offense level should be increased 6 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(D), because the actual and intended loss was more than $30,000 but less than $70,000.

3.   The parties agree and stipulate that the defendant's offense level should be increased two levels, pursuant to U.S.S.G. § 3B1.3 for abuse of a position of public trust.

4.   The parties agree that if the defendant enters guilty pleas to Counts Three and Four in accordance with this Guilty Plea Agreement, then defendant's offense level will be reduced two levels under U.S.S.G. § 3E1.1 for acceptance of responsibility as of the date of the entry of the guilty pleas.  The government reserves the right to assess the defendant's acceptance of responsibility as of the time of sentencing.

The defendant understands and agrees that the stipulations are not binding on the Court or the Probation Office, that the Court may make factual or legal determinations that differ

4

from the stipulation that may result in a higher sentence range under the Guidelines, and that the defendant may not withdraw his guilty plea if the Court declines to accept the stipulations.

The defendant has agreed to waive his rights to appeal or collaterally attack his conviction and sentence.

## IV. <u>MAXIMUM PENALTIES</u>

The defendant understands and has had explained to him by counsel that the Court may impose the following statutory maximum sentence:

- Count 3 (conspiracy to commit mail fraud): 5 years imprisonment, a three year term of supervised release, a fine of not more than $250,000, a $100 special assessment and restitution.

- Count 4 (mail fraud): 5 years imprisonment, a three year term of supervised release, a fine of not more than $250,000, a $100 special assessment and restitution.

<u>Total Maximum</u>: 10 years imprisonment, a three year term of supervised release, a $500,000 fine, a $200 special assessment and full restitution.

The defendant further understands that supervised release may be revoked if its terms and conditions are violated. When supervised release is revoked, the original term of imprisonment may be increased by 2 years in the case of Class C and D felonies. Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will have to serve the original sentence, plus a substantial additional period, without credit for time already spent on supervised release.

## V. <u>FACTUAL BACKGROUND</u>

The government would establish its case against VAUGHN through: (a) digital

5

recordings of telephone conversations, including conversations of the defendant with SHAMSUD-DIN ALI and JOHN CHRISTMAS, intercepted pursuant to Court authorization under 18 U.S.C. § 2518; (b) videotape recordings of the defendant and SHAMSUD-DIN ALI, and physical surveillance of the defendant and SHAMSUD-DIN ALI conducted by law enforcement agents;; (c) the testimony of witnesses from the City of Philadelphia Law Department, Bowman Properties, Limited ("Bowman Properties") and former employees of KIFS; and (d) business and financial records obtained during the investigation.  If this matter were to proceed to trial, the government's evidence would establish the following facts beyond a reasonable doubt.

The Scheme to Defraud the City of Philadelphia

Beginning in or about April 2001 and continuing through in or about April 2002, SHAMSUD-DIN ALI, together with JOHN CHRISTMAS and VAUGHN, participated in a scheme to defraud the City of Philadelphia and its citizens and to obtain money and property, namely a professional service contract for KIFS and the payment of a $60,595.61 fee to KIFS under that contract, through materially false and fraudulent pretenses, representations and promises.  The defendants accomplished this scheme by:

(a) causing the City of Philadelphia Law Department ("Law Department") to award a contract to KIFS to serve as co-counsel in the collection of delinquent taxes, by falsely representing that KIFS and defendant SHAMSUD-DIN ALI had discovered a delinquent taxpayer, who was unknown to the City of Philadelphia and who was willing to pay its taxes through KIFS, when in fact the delinquent taxpayer was fully known to the Law Department and had not been discovered by KIFS or SHAMSUD-DIN ALI; and

6

(ii) causing the Law Department to pay KIFS and SHAMSUD-DIN ALI a fee of $60,595.61 by falsely representing that KIFS and SHAMSUD-DIN ALI had provided services as co-counsel on behalf of the Law Department in connection with settlement and collection of real estate tax delinquencies owed to the City of Philadelphia, when in fact KIFS and SHAMSUD-DIN ALI had not provided such services.

The Collection of Delinquent Taxes by the Law Department

Philadelphia real estate taxes became due and payable in March of each year, and became delinquent if the taxpayer did not pay the tax in full by January 1 of the following year. The Law Department was responsible for the collection of delinquent taxes owed to the City of Philadelphia.  The Law Department occasionally entered into professional service contracts with vendors to serve as co-counsel.  Pursuant to a "discovery" agreement, the City would pay co-counsel a fee, based upon a percentage of the amount of taxes recovered, if co-counsel identified delinquent taxpayers that were unknown to the City and caused the taxpayer to come into compliance with its obligations to the City.  The Law Department could also agree to pay co-counsel a fee on the basis of "ancillary jurisdiction."  Under ancillary jurisdiction, the City would pay a fee, at the discretion of the City Solicitor, if co-counsel caused a taxpayer to come into compliance with its tax obligations which were not covered under the vendor's primary contract with the City.  The City Solicitor required that co-counsel cause the taxpayer to come into compliance with its delinquent tax liabilities to earn a fee under ancillary jurisdiction.

The Taxpayers: Bowman Properties, Ltd. and RS

Bowman Properties was a partnership doing business in Pennsylvania.  Bowman Properties owned, operated and developed commercial and residential real estate, primarily in the

7

Chestnut Hill neighborhood of Philadelphia.  RS was the general partner of Bowman Properties.

RS also owned real estate in the City of Philadelphia.

In January 1999, Bowman Properties and RS owed delinquent real estate taxes to

the City of Philadelphia for multiple properties for the tax years 1995 through 1998.

In December 1998, RS requested VAUGHN to assist Bowman Properties resolve the tax

delinquencies with the City of Philadelphia.  VAUGHN negotiated a settlement with the Law

Department, and Bowman Properties and RS agreed to pay $240,989.90 to satisfy their

delinquent real estate tax liabilities for tax years 1995 through 1998.  A Law Department lawyer

negotiated the 1999 settlement agreement with VAUGHN on behalf of Bowman Properties,

without the City hiring co-counsel or paying a fee to co-counsel.

Bowman's Second Tax Delinquency

By January 2001, Bowman Properties and RS had again become delinquent in

their real estate taxes and owed in excess of $600,000 on multiple properties for the tax years

1999 and 2000.  As of the Spring of 2001, the Law Department had commenced enforcement

action against Bowman Properties and RS to collect the delinquent real estate taxes.

In the Spring of 2001, RS contacted VAUGHN and asked him to assist Bowman

Properties resolve the real estate tax delinquency with the City of Philadelphia.  In April 2001,

Bowman Properties sold a tract of real property and obtained funds to pay its taxes.  On or about

April 24, 2001, the Bowman Properties bookkeeper gave VAUGHN three cashiers checks in the

total amount of $204,000, and instructed VAUGHN to deliver the checks to the City of

Philadelphia in payment of real estate taxes owed by Bowman Properties and RS.  Contrary to

these instructions, and unbeknownst to Bowman Properties, VAUGHN did not deliver the three

8

cashiers checks to the City of Philadelphia.  Rather, in furtherance of the scheme to defraud,

VAUGHN maintained personal possession of the three cashiers checks until October 2001.

VAUGHN held the three cashiers checks until after KIFS had obtained the professional service

contract with the Law Department, so that KIFS could claim entitlement to the payment of a

commission in connection with the Bowman Properties tax payments under the contract.

On or about July 25, 2001, the Bowman Properties bookkeeper gave VAUGHN

two additional checks totaling $242,221.38, and again instructed VAUGHN to deliver the checks

to the City of Philadelphia in payment of real estate taxes owed by Bowman Properties and RS.

On September 28, 2001, the Bowman Properties bookkeeper gave VAUGHN sixteen checks

totaling $71,706.25 and instructed VAUGHN to deliver the checks to the City of Philadelphia in

payment of real estate taxes owed by Bowman Properties and RS.  Again, VAUGHN failed to

deliver the checks to the City of Philadelphia.

KIFS Professional Service Contract with the Law Department

The government's evidence would establish beyond a reasonable doubt that to

advance the scheme to defraud, SHAMSUD-DIN ALI, JOHN CHRISTMAS and VAUGHN

worked together to obtain a professional services contract for KIFS with the Law Department

through materially false representations.

On or about May 31, 2001, SHAMSUD-DIN ALI sent a letter to the Law

Department in which ALI falsely represented to the Law Department that a taxpayer who owed a

substantial liability to the City had contacted KIFS and had expressed a desire to resolve it.

SHAMSUD-DIN ALI represented that the taxpayer lacked knowledge of the total amount owed

and that the City had no collection actions pending.  SHAMSUD-DIN ALI requested jurisdiction

for KIFS to act as co-counsel with respect to settling the matter.

The representations in the May 31, 2001 letter were materially false in that the unidentified taxpayer was in fact, Bowman Properties and RS, who: (a) had not contacted KIFS regarding their real estate tax liabilities or any other matter; (b) already knew the amount of their real estate tax liabilities; and (c) already knew that the City of Philadelphia had commenced enforcement action to collect the delinquent real estate taxes.

In reliance upon the misrepresentations of SHAMSUD-DIN ALI, the Law Department awarded a professional services contract to KIFS.  On or about June 28, 2001, the Law Department sent a letter by the United States mail, to SHAMSUD-DIN ALI, advising him that KIFS was "authorized to commence collection services as to taxpayers who are not currently on the City's tax rolls and who will voluntarily comply with tax obligations as a result of settlements negotiated by KIFS."

After the Law Department advised SHAMSUD-DIN ALI that KIFS was authorized to commence discovery services on behalf of the Law Department, SHAMSUD-DIN ALI provided a spreadsheet to the Law Department that identified the taxpayer that KIFS had allegedly discovered, and the amounts of taxes owed to the City.  When Law Department employees reviewed the spreadsheet provided by SHAMSUD-DIN ALI, the Law Department learned that the taxpayer was in fact Bowman Properties.  The Law Department concluded that KIFS could not earn a fee pursuant to its discovery contract because the City had known about the real estate tax delinquency and had commenced enforcement action to collect the delinquent real estate taxes before KIFS had contacted the Law Department.

Thereafter, SHAMSUD-DIN ALI,  JOHN CHRISTMAS and VAUGHN

10

discussed a plan for obtaining the Law Department's approval for payment of a fee to KIFS in connection with the Bowman Properties real estate tax payments even though KIFS had not discovered the delinquent taxpayers.  On August 14, 2001, CHRISTMAS told ALI that CHRISTMAS was going to call the Law Department because "this has to get done or else they will lose the taxpayer."  ALI told CHRISTMAS that they should "give me the whole thing."   At approximately 4:53 p.m. on August 14, 2001, CHRISTMAS told ALI that he was going "to speak with them every day because I need to get this closed out this week or the taxpayer is not going to be around anymore.... I mean he's gonna go ahead and do it himself."  ALI told CHRISTMAS "maybe they'll stop shortchanging me and we'll get the benefit."  CHRISTMAS told ALI that was his intention.  In September 2001, based on communications from JOHN CHRISTMAS, the Law Department decided to give KIFS the opportunity to earn a fee in connection with the Bowman Properties real estate tax delinquency pursuant to ancillary jurisdiction.

<u>SHAMSUD-DIN ALI Delivers the Checks Given to VAUGHN</u>

Throughout the period from July 2001 through October 5, 2001, SHAMSUD-DIN ALI and STEVEN VAUGHN had numerous telephone conversations during which ALI advised VAUGHN of the efforts of ALI and CHRISTMAS to obtain a contract for KIFS with the Law Department, that would allow KIFS to claim a fee for collecting the Bowman Properties real estate taxes.

On or about September 26, 2001, SHAMSUD-DIN ALI delivered to the Law Department a "Provider Agreement (Discovery Services)" between the Law Department and KIFS, signed by SHAMSUD-DIN ALI and FARIDAH ALI.  Although the Provider Agreement

11

between the City and KIFS was a discovery contract, the Provider Agreement also contained a provision that KIFS could earn a fee of 10% on real estate tax collection pursuant to ancillary jurisdiction.

On or about October 5, 2001, SHAMSUD-DIN ALI delivered to the Law Department the same checks that the Bowman Properties bookkeeper had delivered to VAUGHN.

On October 5, 2001, VAUGHN had a telephone conversation with SHAMSUD-DIN ALI during which VAUGHN told ALI: "I was going to call JOHN CHRISTMAS and let him know . . . we got all the stuff, and you know, you gonna be turning it in."

On October 6, 2001, VAUGHN had a telephone conversation with SHAMSUD-DIN ALI during which VAUGHN asked how SHAMSUD-DIN ALI made out yesterday, and ALI told VAUGHN: "I turned it in."  VAUGHN told ALI: "All right, well they got it now."  ALI told VAUGHN: "They cooking it.  It's already done."  VAUGHN told ALI that John, meaning JOHN CHRISTMAS, told VAUGHN that the guy in the Law Department called CHRISTMAS because "they had some concerns."  VAUGHN said that CHRISTMAS told VAUGHN that he was waiting for him because CHRISTMAS thought they were going to call him.  VAUGHN told ALI that VAUGHN told CHRISTMAS: "it don't matter  . . . SHAMSUD-DIN turned everything in."  VAUGHN told ALI that CHRISTMAS said: "Well, don't worry about it.  The deal is a deal, and it's done."

ALI, CHRISTMAS and VAUGHN Use the Mayor's Office to Pressure the Law Department

After receiving the checks from defendant SHAMSUD-DIN ALI, the Law Department raised questions about paying a fee to KIFS because KIFS had not obtained a

12

settlement agreement with Bowman Properties and RS.  When the Law Department raised questions about paying KIFS a fee, SHAMSUD-DIN ALI, JOHN CHRISTMAS, VAUGHN pressured the Law Department to approve the payment of fee to KIFS through the intervention of the Mayor's Office.

On or about November 14, 2001, GB, the Secretary of External Affairs to Philadelphia Mayor John Street, and the Acting City Solicitor for the City of Philadelphia agreed that the Law Department would offer to settle the Bowman Properties real estate tax delinquency for payment of the tax principal plus interest, waiving penalties as to all properties except one property that was scheduled for sheriff's sale.  GB and the Acting City Solicitor agreed that the City would pay KIFS a fee of 5% of the amount collected and that KIFS would be instructed to approach Bowman Properties with the City's settlement demand and to negotiate the final terms.

On or about November 15, 2001, the Law Department returned the checks that SHAMSUD-DIN ALI had delivered to the Law Department, to SHAMSUD-DIN ALI.

On November 15, 2001, SHAMSUD-DIN ALI had a telephone conversation with VAUGHN during which VAUGHN told ALI: "I just left our guy.  You know, CHRISTMAS. He's cool.  He told me everything, everything was still on . . . ."

JOHN CHRISTMAS Misrepresents KIFS' Role in the Bowman Properties Tax Collection

On or about November 26, 2001, JOHN CHRISTMAS advised the Law Department that he wanted a10% fee for KIFS.  According to a Law Department official, JOHN CHRISTMAS represented that SHAMSUD-DIN ALI "did in fact bring Bowman to the table, so it's legal for the City to pay KIFS."  JOHN CHRISTMAS' representation to the Law Department was false in that KIFS had performed no services in connection with the collection of delinquent

13

real estate taxes owed to the City of Philadelphia by Bowman Properties, and had not caused

Bowman Properties to agree to pay its delinquent taxes.  However, in reliance upon the

misrepresentation by JOHN CHRISTMAS that SHAMSUD-DIN ALI had caused Bowman

Properties to agree to pay its delinquent real estate taxes, the Law Department agreed to pay

KIFS a fee of 10% of the amount collected from Bowman Properties and RS.

The Law Department Settles with Bowman Properties

On or about December 24, 2001, the Law Department sent a proposed settlement

agreement regarding the delinquent real estate taxes owed by Bowman Properties and RS to RS

by United States mail.  From January 10, 2002 through January 28, 2002, JOHN CHRISTMAS

revised the proposed settlement agreement.  On February 20, 2002, RS executed a written

settlement agreement on behalf of himself and Bowman Properties.  Bowman Properties and RS

agreed to pay the City of Philadelphia $657,914.12 in satisfaction of the City's claim for

delinquent real estate taxes, interest, penalties, attorney's fees and costs for tax years 1999

through 2001.  KIFS had no participation in the negotiation and preparation of the settlement

agreement between the City of Philadelphia and Bowman Properties.

Maintaining the False Pretense that KIFS Performed Professional Services

Even though the Law Department negotiated and obtained the settlement

agreement with Bowman Properties without KIFS providing any services, SHAMSUD-DIN

ALI, JOHN CHRISTMAS and VAUGHN worked together to maintain the false appearance that

KIFS had caused Bowman Properties and RS to pay their delinquent real estate taxes.

On December 27, 2001, the Law Department sent a conformed, executed copy of

the Provider Agreement to KIFS by United States mail.

14

On or about January 23, 2002, SHAMSUD-DIN ALI had a telephone conversation with VAUGHN, during which VAUGHN stated that he had told JOHN CHRISTMAS that VAUGHN was going to get the checks and give them to ALI.  VAUGHN told ALI that CHRISTMAS wanted VAUGHN to give everything to ALI, including the signed agreement, so ALI "can turn it all in together."

On or about February 8, 2002, SHAMSUD-DIN ALI had a telephone conversation with VAUGHN, during which VAUGHN told ALI: "I just got the money, I don't have the signed agreement."   VAUGHN told ALI that John, meaning JOHN CHRISTMAS, wanted "everything to go to him so that he could take it over there."  VAUGHN asked ALI if he wanted VAUGHN to give it to CHRISTMAS because "CHRISTMAS is gonna say that you did it anyway."  ALI told VAUGHN that ALI will take it "over there."

On or about February 21, 2002, defendant SHAMSUD-DIN ALI delivered three checks to the Law Department, consisting of two new checks that the Bowman Properties bookkeeper had given to VAUGHN on December 28, 2001, and a third check that the Bowman Properties bookkeeper had given to VAUGHN in February 2002, in payment of the balance owed to the City of Philadelphia by Bowman Properties and RS pursuant to the written settlement agreement.

SHAMSUD-DIN ALI Pays VAUGHN $2,000[1]

---

[1]  Counsel has advised the government that the defendant does not agree with all of the facts stated by the government regarding the $2,000 payment from SHAMSUD-DIN ALI. Although the government believes it could establish these facts beyond a reasonable doubt at trial, these facts are not necessary to establish the essential elements of the offenses to which the defendant has agreed to plead guilty.

On or about March 26, 2002, the City of Philadelphia issued a check in the amount of $60,595.61 payable to KIFS, in payment of an invoice submitted by ALI for a commission for KIFS as co-counsel for the Bowman Properties real estate tax collection.

On or about April 3, 2002, a check in the amount of $60,595.61 was deposited into KIFS' business checking account.

On April 18, 2002, defendant SHAMSUD-DIN ALI and STEVEN VAUGHN met at the KIFS business office at 7108 Germantown Avenue.  During this meeting, which was recorded on audio and videotape, VAUGHN told ALI that he needed money to pay personal expenses.  VAUGHN told ALI he "needed at least 54," meaning $5,400.  ALI told VAUGHN he could get "two grand" for VAUGHN.

On or about April 18, 2002, defendant SHAMSUD-DIN ALI cashed a check drawn on the KIFS business checking account in the amount of $2,000 made payable to "Shamsud-din Ali."

At 2:09 p.m. on or about April 18, 2002, defendant SHAMSUD-DIN ALI left a voice-mail message for STEVEN VAUGHN, during which ALI told VAUGHN: "I can cover the first request you made.  I already picked that up.  But I'm looking for something else."

From approximately 3:25 p.m. until approximately 4:10 p.m. on or about April 18, 2002, defendant SHAMSUD-DIN ALI and STEVEN VAUGHN met at ALI's personal residence located at 36 Latham Parkway, Elkins Park.  Investigative agents conducted surveillance of the meeting.  An agent observed VAUGHN carrying cash in his hand when he left the meeting.

16

VI. <u>CONCLUSION</u>

The Court should accept the defendant's guilty plea to Count 18 of the superseding indictment.

Respectfully submitted

PATRICK L. MEEHAN
United States Attorney
Eastern District of Pennsylvania

ROBERT E. COURTNEY III
Deputy United States Attorney
Chief, Organized Crime Strike Force

DATE: _____    _____

FRANK A. LABOR III
Assistant United States Attorney
Deputy Chief, Organized Crime Strike Force

_____

ANTHONY J. WZOREK
Assistant United States Attorney

_____

ZANE D. MEMEGER
Assistant United States Attorney

CERTIFICATE OF SERVICE

FRANK A. LABOR III, an Assistant United States Attorney, certifies that a copy

of The United States' Memorandum in Support of the Defendant's Change of Plea was served

upon counsel of record by facsimile and by United States mail, first class postage prepaid, on

April 6, 2005, addressed as follows:

MICHAEL F. GIAMPIETRO
239 S. Camac Street
Philadelphia, PA 19107
(215) 731-9887 (Fax)

_____
FRANK A. LABOR III
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        :

        v.                    :        CRIMINAL NO.  04-00611-04

STEVEN VAUGHN            :

<u>GUILTY PLEA AGREEMENT</u>

Under Rule 11 of the Federal Rules of Criminal Procedure, the government, the defendant, and the defendant's counsel enter into the following guilty plea agreement.  Any reference to the United States or the government in this agreement shall mean the Office of the United States Attorney for the Eastern District of Pennsylvania.

1.        The defendant agrees to plead guilty to Counts Three and Four of the Superseding Indictment charging him with conspiracy to commit mail fraud and mail fraud, in violation of Title 18, United States Code, Sections 371 and 1341, all arising from a scheme to defraud the City of Philadelphia and its citizens, and to obtain money and property through materially false and fraudulent representations, conducted by the defendant and his co-conspirators SHAMSUD-DIN ALI and JOHN CHRISTMAS, during the period April 2001 through April 2002, involving the award of a professional services contract by the City of Philadelphia Law Department to Keystone Information & Financial Services, Inc., and the payment of a $60,595.61 fee by the City of Philadelphia to KIFS, in connection with the payment of a real estate tax delinquency owed to the City of Philadelphia, as charged in Count 3.  The defendant further acknowledges his waiver of rights, as set forth in the attachment to this agreement.

2.     The defendant agrees to pay the special victims/witness assessment in the amount of $200 before the time of sentencing and shall provide a receipt from the Clerk to the government before sentencing as proof of this payment.

3.     The defendant agrees to pay a fine and to make restitution as ordered by the Court.

4.     Defendant waives any claim under the Hyde Amendment, 18 U.S.C. §3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

5.     At the time of sentencing, the government will:

a.     Move to dismiss Counts 5 and 6 of the Superseding Indictment as to this defendant.  The defendant waives the statute of limitations as to all counts to be dismissed under this agreement and agrees that if the defendant withdraws from, or successfully challenges, the guilty plea entered under this agreement, or if these counts are otherwise reinstated under the terms of this agreement, neither the statute of limitations nor the Double Jeopardy clause will bar prosecution on any of these dismissed counts.

b.     Make whatever sentencing recommendation as to imprisonment, fines, forfeiture, restitution and other matters which the government deems appropriate.

c.     Nothing in this agreement shall limit the government in its comments in, and responses to, any post-sentencing matters.

20

6.      The defendant understands, agrees and has had explained to him by counsel that the Court may impose the following statutory maximum sentence:

- Count 3 (conspiracy to commit mail fraud): 5 years imprisonment, a three year term of supervised release, a fine of not more than $250,000, a $100 special assessment and restitution.

- Count 4 (mail fraud): 5 years imprisonment, a three year term of supervised release, a fine of not more than $250,000, a $100 special assessment and restitution.

            Total Maximum is: 10 years imprisonment, a three year term of supervised release, a $500,000 fine, and a $200 special assessment.  Full restitution also may be ordered.

The defendant further understands that supervised release may be revoked if its terms and conditions are violated.  When supervised release is revoked, the original term of imprisonment may be increased by 2 years in the case of Class C and D felonies.  Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will have to serve the original sentence, plus a substantial additional period, without credit for time already spent on supervised release.

7.      The defendant may not withdraw his plea because the Court declines to follow any recommendation, motion or stipulation by the parties to this agreement.  No one has promised or guaranteed to the defendant what sentence the Court will impose.

8.      Pursuant to § 6B1.4 of the Sentencing Guidelines, the parties enter into the following stipulations under the Sentencing Guidelines Manual effective November 1, 2001.  It is understood and agreed that: (1) the parties are free to argue the applicability of any other provision of the Sentencing Guidelines, including offense conduct, offense characteristics,

21

criminal history, adjustments and departures; (2) these stipulations are not binding upon either

the Probation Department or the Court; and (3) the Court may make factual and legal

determinations that differ from these stipulations and that may result in an increase or decrease in

the Sentencing Guidelines range and the sentence that may be imposed:

a.       The parties agree and stipulate that the applicable sentencing

guideline is U.S.S.G. § 2B1.1(a), and that the base offense level is level 6.

b.       The parties agree and stipulate that the defendant's offense level

should be increased 6 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(D), because the actual and

intended loss was more than $30,000 but less than $70,000.

c.       The parties agree and stipulate that the defendant's offense level

should be increased two levels, pursuant to U.S.S.G. § 3B1.3 for abuse of a position of public

trust.

d.       The parties agree that if the defendant enters guilty pleas to Counts

Three and Four in accordance with this Guilty Plea Agreement, then defendant's offense level

will be reduced two levels under U.S.S.G. § 3E1.1 for acceptance of responsibility as of the date

of the entry of the guilty pleas.  The government reserves the right to assess the defendant's

acceptance of responsibility as of the time of sentencing.

9.       In exchange for the undertakings made by the government in entering this

plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally

attack the defendant's conviction, sentence, or any other matter relating to this prosecution,

whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C.

§ 1291, 28 U.S.C. § 2255, or any other provision of law.

a.   Notwithstanding the waiver provision above, if the government appeals from the sentence, then the defendant may file a direct appeal of his sentence.

b.   If the government does not appeal, then notwithstanding the waiver provision set forth in this paragraph, the defendant may file a direct appeal but may raise only claims that:

i    the defendant's sentence on any count of conviction exceeds the statutory maximum for that count as set forth in paragraph 6 above; or

ii   the sentencing judge unreasonably departed upward from the otherwise applicable sentencing guideline range.

If the defendant does appeal pursuant to this paragraph, no issue may be presented by the defendant on appeal other than those described in this paragraph.

10.   The defendant is satisfied with the legal representation provided by the defendant's lawyer; the defendant and this lawyer have fully discussed this plea agreement; and the defendant is agreeing to plead guilty because the defendant admits that he is guilty.

11.   It is agreed that the parties' guilty plea agreement contains no additional promises, agreements or understandings other than those set forth in this written guilty plea

23

agreement, and that no additional promises, agreements or understandings will be entered into

unless in writing and signed by all parties.

PATRICK L. MEEHAN
United States Attorney
Eastern District of Pennsylvania

_____          _____
STEVEN VAUGHN                                    ROBERT E. COURTNEY, III
Defendant                                              Chief, Organized Crime Section
                                                       Deputy United States Attorney

_____          _____
MICHAEL F. GIAMPIETRO                        FRANK A. LABOR III
Counsel for Defendant                             Assistant Chief, OC Strike Force
                                                       Assistant United States Attorney

                                                 _____
                                                 ANTHONY J. WZOREK
                                                 Assistant United States Attorney

_____          _____
                                                 ZANE D. MEMEGER
                                                 Assistant United States Attorney

Date: _____, 2005

24

Attachment

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA         :

                    v.                    :              CRIMINAL NO.  04-00611-04

STEVEN VAUGHN                         :


## ACKNOWLEDGMENT OF RIGHTS

I hereby acknowledge that I have certain rights that I will be giving up by pleading guilty.

1.      I understand that I do not have to plead guilty.

2.      I may plead not guilty and insist upon a trial.

3.      At that trial, I understand

      a.      that I would have the right to be tried by a jury that would be selected from the Eastern District of Pennsylvania and that along with my attorney, I would have the right to participate in the selection of that jury;

      b.      that the jury could only convict me if all twelve jurors agreed that they were convinced of my guilt beyond a reasonable doubt;

      c.      that the government would have the burden of proving my guilt beyond a reasonable doubt and that I would not have to prove anything;

      d.      that I would be presumed innocent unless and until such time as the jury was convinced beyond a reasonable doubt that the government had proven that I was guilty;

      e.      that I would have the right to be represented by a lawyer at this trial and at any appeal following the trial, and that if I could not afford to hire a lawyer, the court would appoint one for me free of charge;

      f.      that through my lawyer I would have the right to confront and cross examine the witnesses against me;

      g.      that I could testify in my own defense if I wanted to and I could subpoena witnesses to testify in my defense if I wanted to;

       h.       that I would not have to testify or otherwise present any defense if I did not want to and that if I did not present any evidence, the jury could not hold that against me.

4.      I understand that if I plead guilty, there will be no trial and I would be giving up all of the rights listed above.

5.      I understand that if I decide to enter a plea of guilty, the judge will ask me questions under oath and that if I lie in answering those questions, I could be prosecuted for the crime of perjury, that is, for lying under oath.

6.      I understand that if I plead guilty, I have waived my right to appeal, except as set forth in appellate waiver provisions of my plea agreement.

7.      Understanding that I have all these rights and that by pleading guilty I am giving them up, I still wish to plead guilty.


_____
STEVEN VAUGHN
Defendant


_____
MICHAEL F. GIAMPIETRO
Counsel for the Defendant

2