IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 04-00611-04 |
| | : | |
| STEVEN VAUGHN | : | |

THE UNITED STATES' SENTENCING MEMORANDUM

The United States of America respectfully submits this memorandum in connection with the sentencing of defendant STEVEN VAUGHN ("VAUGHN"), scheduled for July 6, 2005.

I. SUMMARY OF THE OFFENSE

On September 29, 2004, the grand jury returned a 48 count indictment against seven defendants, including VAUGHN. Count Three of the indictment charged VAUGHN and co-defendants Shamsud-din Ali and John Christmas with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371 and § 1341. Counts Four, Five and Six charged VAUGHN, Shamsud-din Ali and Christmas with mail fraud, in violation of § 1341. The grand jury returned a superseding indictment on February 2, 2005, charging VAUGHN with the same offenses.

The superseding indictment averred that from January 1998 through October 2003, Shamsud-din Ali and Faridah Ali operated a racketeering enterprise that engaged in a pattern of criminal acts to generate illegal proceeds for the Alis, including mail fraud, wire fraud, bank fraud, extortion, commercial bribery, and interstate travel and use of the mails in aid of racketeering. The racketeering enterprise consisted of Shamsud-din Ali, Faridah Ali, the Sister Clara Muhammad School, Keystone Information & Financial Services, Inc. ("KIFS"), a corporate entity owned by the Alis, and Hi-Technology Recycling Waste Management, Inc..

Shamsud-din Ali used KIFS to conduct criminal schemes that were part of the pattern of racketeering activity. Racketeering Act One charged that Shamsud-din Ali used KIFS to defraud the City of Philadelphia and its citizens by falsely representing that KIFS performed services for the City in connection with the collection of real estate taxes owed by a delinquent taxpayer. <u>See</u> Superseding Indictment, Count One, Racketeering Act Once, ¶¶ 26-72, at 9-27. Counts Three through Six, charged VAUGHN with participating in the same scheme to defraud.

On April 7, 2005, VAUGHN pleaded guilty to Counts Three and Four. Pursuant to a Guilty Plea Agreement, the government has agreed to dismiss Counts Five and Six at sentencing. VAUGHN has agreed to pay a $200 special assessment and any fine or restitution ordered by the Court.

On June 14, 2005, following an eight week trial, a jury convicted Shamsud-din Ali of 22 counts of the superseding indictment. The jury convicted Ali of all charges relating to the scheme to defraud the City of Philadelphia. The jury convicted Ali of racketeering and racketeering conspiracy, finding that the scheme was part of the pattern of a racketeering activity conducted by Ali. The jury acquitted co-defendant John Christmas of the mail fraud charges.

## II. <u>MAXIMUM PENALTIES</u>

The Court may impose the following maximum sentences based upon the defendant's guilty pleas:

- Count 3 (conspiracy to commit mail fraud): 5 years imprisonment, a three year term of supervised release, a fine of not more than $250,000, a $100 special assessment and restitution.

- Count 4 (mail fraud): 5 years imprisonment, a three year term of supervised

release, a fine of not more than $250,000, a $100 special assessment and restitution.

- Total Maximum: 10 years imprisonment, a three year term of supervised release, a $500,000 fine, a $200 special assessment and full restitution.

## II. SENTENCING STIPULATIONS

The parties have agreed to the following stipulations for the purpose the Sentencing Guidelines effective November 1, 2001:

A.  The applicable sentencing guideline is § 2B1.1(a) and the base offense level is level 6.

B.  The base offense level is increased 6 levels pursuant to § 2B1.1(b)(1)(D), because the actual and intended loss was more than $30,000 but less than $70,000.

C.  The base offense level is increased two levels pursuant to § 3B1.3, because VAUGHN abused a position of public trust.

D.  The offense level is reduced two levels under § 3E1.1 for the defendant's acceptance of responsibility as of the date of the guilty pleas.  The government has reserved the right to assess the defendant's acceptance of responsibility as of the time of sentencing.

## III. SENTENCING GUIDELINES CALCULATION

The government agrees with the findings of the Probation Office in the PSI Report that under the 2001 Sentencing Guidelines:

- the defendant's base offense level is 6 under § 2B1.1;

- the base offense level is increased by 6 levels under § 2B1.1(b)(1)(D) because the amount of the intended loss was more than $30,000 but less than $70,000;

- the base offense level is increased 2 levels under § 3B1.3 because the defendant

3

abused a position of trust; and

- the base offense level is reduced 2 levels under § 3E1.1(a) for acceptance of responsibility.

The government agrees with the Probation Office that the defendant's criminal history is Category I.

Accordingly, the defendant's Sentencing Guidelines range is level 12 in criminal history category I, which results in a sentencing range of **ten to sixteen months imprisonment**.

IV. THE OFFENSE CONDUCT

The Scheme to Defraud the City of Philadelphia

Beginning in April 2001 and continuing through April 2002, Shamsud-din Ali, together with John Christmas and VAUGHN, conducted a scheme to defraud the City of Philadelphia and its citizens and to obtain money and property, namely a professional service contract for KIFS and the payment of a $60,595.61 fee under that contract. The defendants accomplished this scheme by:

(a) causing the City of Philadelphia Law Department ("Law Department") to award a professional service contract to KIFS to serve as co-counsel in the collection of delinquent taxes, by falsely representing that Shamsud-din Ali had discovered a delinquent taxpayer, who was unknown to the City of Philadelphia and who was willing to pay its taxes through KIFS, when in fact the taxpayer was known to the Law Department and had not been discovered by Shamsud-din Ali; and

(ii) causing the Law Department to pay KIFS a $60,595.61 fee by falsely representing that KIFS and Shamsud-din Ali had provided services in connection with settlement

and collection of real estate tax delinquencies owed to the City of Philadelphia, when in fact KIFS and Shamsud-din Ali had not provided such services.

The Collection of Delinquent Taxes by the Law Department

Philadelphia real estate taxes became due and payable in March and became delinquent if not paid in full by January 1 of the following year. The Law Department was responsible for the collection of delinquent taxes. The Law Department entered into professional service contracts with vendors to serve as co-counsel. Pursuant to a "discovery" contract, the City paid co-counsel a fee based upon a percentage of the taxes recovered, if co-counsel identified delinquent taxpayers that were unknown to the City and caused the taxpayers to pay their taxes to the City. The Law Department could also pay co-counsel a fee on the basis of ancillary jurisdiction. Under ancillary jurisdiction, the City would pay a fee, at the discretion of the City Solicitor, if co-counsel caused a taxpayer to pay taxes which were not covered under the vendor's primary contract with the City. The City Solicitor required that co-counsel cause the taxpayer to come into compliance with its delinquent tax liabilities to earn a fee under ancillary jurisdiction.

Bowman Properties, Ltd. and Richard Snowden

Bowman Properties Limited ("Bowman Properties") owned, operated and developed commercial and residential real estate, primarily in the Chestnut Hill section of Philadelphia. Richard Snowden was the general partner of Bowman Properties. Snowden also owned real estate in the City of Philadelphia.

In January 1999, Bowman Properties and Snowden owed real estate taxes to the City of Philadelphia for multiple properties for the tax years 1995 through 1998. In December

1998, Snowden asked VAUGHN to assist Bowman Properties resolve the tax delinquencies with the City of Philadelphia. VAUGHN negotiated a settlement with the Law Department, and Bowman Properties and Snowden agreed to pay $240,989.90 to satisfy their delinquent real estate taxes for 1995 through 1998. A Law Department lawyer negotiated the settlement agreement with VAUGHN without the City hiring co-counsel or paying a fee to co-counsel.

Bowman's Second Tax Delinquency

By January 2001, Bowman Properties and Snowden had again become delinquent in their real estate taxes and owed in excess of $700,000 on multiple properties for the tax years 1999 and 2000. As of the Spring of 2001, the Law Department had commenced enforcement action against Bowman Properties and Snowden to collect the delinquent real estate taxes.

In the Spring of 2001, Snowden contacted VAUGHN and asked him to assist Bowman Properties resolve the tax delinquency. Snowden wanted VAUGHN to obtain the same type of agreement with the City that he had worked out in 1999. VAUGHN agreed to assist Snowden and Bowman Properties. However, instead of providing legitimate constituent services, VAUGHN decided to work in concert with Shamsud-din Ali to defraud the City and its citizens.

In April 2001, Bowman Properties sold a tract of real property and obtained funds to pay its taxes. On April 24, 2001, Suzanne Clark, the Bowman Properties bookkeeper, gave VAUGHN three cashiers checks in the total amount of $204,000 and instructed VAUGHN to deliver the checks to the City of Philadelphia to pay real estate taxes owed by Bowman Properties and Snowden. On July 25, 2001, Clark gave VAUGHN two additional checks totaling $242,221.38 and instructed VAUGHN to deliver the checks to the City of Philadelphia

to pay real estate taxes. On September 28, 2001, Clark gave VAUGHN sixteen checks totaling $71,706.25 and instructed VAUGHN to deliver the checks to the City of Philadelphia to pay real estate taxes.

Contrary to Clark's instructions and unbeknownst to Bowman Properties, VAUGHN did not deliver the checks to the City. Rather, in furtherance of the scheme to defraud, VAUGHN maintained possession of the checks until October 2001. VAUGHN held the checks until after the co-conspirators had obtained a co-counsel contract for KIFS, so that ALI could deliver the Bowman Properties checks to the Law Department thereby creating the false appearance that KIFS had made the tax collection and was entitled to a fee under the contract.

KIFS' Professional Service Contract

Shamsud-din Ali, Christmas and VAUGHN worked together to obtain a professional services contract for KIFS with the Law Department through materially false representations. On or about May 31, 2001, Shamsud-din Ali sent a letter to the Law Department in which Ali falsely represented to the Law Department that a taxpayer who owed a substantial liability to the City had contacted KIFS and had expressed a desire to resolve it. Shamsud-din Ali represented that the taxpayer lacked knowledge of the total amount owed and that the City had no collection actions pending. Shamsud-din Ali requested jurisdiction for KIFS to act as co-counsel with respect to settling the matter. The representations in the May 31, 2001 letter were materially false in that the unidentified taxpayer was in fact, Bowman Properties and Snowden, who: (a) had not contacted KIFS regarding their real estate tax liabilities or any other matter; (b) already knew the amount of their real estate tax liabilities; and (C) already knew that the City of Philadelphia had commenced enforcement action to collect the delinquent real estate

taxes.

In reliance upon the misrepresentations of Shamsud-din Ali, the Law Department awarded a professional services contract to KIFS. On or about June 28, 2001, the Law Department sent a letter by the United States mail, to Shamsud-din Ali, advising him that KIFS was "authorized to commence collection services as to taxpayers who are not currently on the City's tax rolls and who will voluntarily comply with tax obligations as a result of settlements negotiated by KIFS."

After the Law Department advised Shamsud-din Ali that KIFS was authorized to commence discovery services on behalf of the Law Department, Shamsud-din Ali provided spreadsheets to the Law Department that identified Bowman Properties as the taxpayer that KIFS had allegedly discovered and the amounts of taxes owed to the City. The Law Department concluded that KIFS could not earn a fee pursuant to its discovery contract because the City had known about the real estate tax delinquency and had commenced enforcement action to collect the delinquent real estate taxes before KIFS had contacted the Law Department.

Thereafter, Shamsud-din Ali, Christmas and VAUGHN worked together to have the Law Department allow KIFS to earn a fee for the Bowman Properties tax matter under ancillary jurisdiction. On August 14, 2001, Christmas told ALI that Christmas was going to call the Law Department because "this has to get done or else they will lose the taxpayer." Ali told Christmas that they should "give me the whole thing." At approximately 4:53 p.m. on August 14, 2001, Christmas told Ali that he was going "to speak with them every day because I need to get this closed out this week or the taxpayer is not going to be around anymore.... I mean he's gonna go ahead and do it himself." Later that same day, Ali spoke with VAUGHN and told him

8

that "John's gonna be on it all day tomorrow, ... he told me today he gonna be on it all day tomorrow 'til he get it done."

On August 21, 2001, VAUGHN had a telephone conversation with Ali, during which VAUGHN told Ali that he was talking to Christmas who told VAUGHN that the Law Department was "talking about you didn't have nothing to do with nothing in real estate." VAUGHN told Ali: "I told John, well, what I'm gonna do is, I'm gonna go over there with him and we're, we're slam, we'll hammer this home...."

On September 4, 2001, VAUGHN had a telephone conversation with Ali during which VAUGHN told Ali: "I called John Christmas just about a half hour ago and we gonna try to slam your deal down tomorrow because they keep playing around too much."

In September 2001, based on communications from Christmas, the Law Department gave KIFS the opportunity to earn a fee on the Bowman Properties real estate tax delinquency pursuant to ancillary jurisdiction.

Shamsud-din Ali Delivers the Bowman Properties Checks

On September 26, 2001, Shamsud-din Ali delivered a copy of a "Provider Agreement (Discovery Services)" to the Law Department, executed Shamsud-din Ali and Faridah Ali as officers of KIFS. The Provider Agreement was a discovery contract, but contained a provision that KIFS could earn a 10% fee on real estate tax collections under ancillary jurisdiction.

On October 5, 2001, Shamsud-din Ali delivered to the Law Department the same checks that Clark had given to VAUGHN. Later that day, VAUGHN had a telephone conversation with Shamsud-din Ali during which VAUGHN told Ali: "I was going to call John

Christmas and let him know . . . we got all the stuff, and you know, you gonna be turning it in."

On October 6, 2001, VAUGHN had a telephone conversation with Shamsud-din Ali during which VAUGHN asked how Shamsud-din Ali made out yesterday, and Ali told VAUGHN: "I turned it in." VAUGHN told Ali: "All right, well they got it now." Ali told VAUGHN: "They cooking it. It's already done." VAUGHN told Ali that Christmas told VAUGHN that the guy in the Law Department called Christmas because "they had some concerns." VAUGHN said that Christmas told VAUGHN that he was waiting for him because Christmas thought they were going to call him. VAUGHN told Ali that VAUGHN told Christmas: "it don't matter . . . Shamsud-Din turned everything in." VAUGHN told Ali that Christmas said: "Well, don't worry about it. The deal is a deal, and it's done."

<u>The Co-Conspirators Pressure the Law Department to Approve a Fee for KIFS</u>

After receiving the checks from Shamsud-din Ali, the Law Department raised questions about paying a fee to KIFS because KIFS had not obtained a settlement agreement with Bowman Properties and Snowden. When the Law Department raised questions about paying KIFS a fee, Shamsud-din Ali, Christmas and VAUGHN worked together to pressure the Law Department in to approving the payment of fee to KIFS through the intervention of the Mayor's Office.

On November 14, 2001, George Burrell, the Secretary of External Affairs to Philadelphia Mayor John Street, and William Thompson, the Acting City Solicitor for the City of Philadelphia, agreed that the City would settle the Bowman Properties real estate tax delinquency. Burrell and Thompson also agreed that the City would pay KIFS a fee of 5% of the amount collected from Bowman Properties, and that KIFS would be instructed to approach

Bowman Properties with the City's settlement demand and negotiate the final terms.

On November 15, 2001, the Law Department returned the checks that Shamsud-din Ali had delivered to the Law Department. The same day, Shamsud-din Ali had a telephone conversation with VAUGHN during which VAUGHN told Ali: "I just left our guy. You know, Christmas. He's cool. He told me everything, everything was still on ...."

The Law Department Settles with Bowman Properties

On or about December 24, 2001, the Law Department sent a proposed settlement agreement regarding the delinquent real estate taxes to Snowden by United States mail. From January 10, 2002 through January 28, 2002, Christmas revised the proposed settlement agreement. On February 20, 2002, Snowden executed a written settlement agreement on behalf of himself and Bowman Properties. Bowman Properties and Snowden agreed to pay the City of Philadelphia $657,914.12 in satisfaction of the City's claim for delinquent real estate taxes, interest, penalties, attorney's fees and costs for tax years 1999 through 2001. KIFS had no participation in the negotiation and preparation of the settlement agreement between the City of Philadelphia and Bowman Properties.

Maintaining the False Pretense that KIFS Performed Professional Services

Even though the Law Department negotiated and obtained the settlement agreement with Bowman Properties without KIFS providing any services, Shamsud-din Ali, Christmas and VAUGHN worked together to maintain the false appearance that KIFS had caused Bowman Properties and Snowden to pay their delinquent real estate taxes.

On or about January 23, 2002, Shamsud-din Ali had a telephone conversation with VAUGHN, during which VAUGHN stated that he had told John Christmas that VAUGHN

was going to get the checks and give them to Ali. VAUGHN told Ali that Christmas wanted VAUGHN to give everything to Ali, including the signed settlement agreement, so Ali "can turn it all in together."

On or about February 8, 2002, Shamsud-din Ali had a telephone conversation with VAUGHN, during which VAUGHN told Ali: "I just got the money, I don't have the signed agreement." VAUGHN told Ali that Christmas wanted "everything to go to him so that he could take it over there." VAUGHN asked Ali if he wanted VAUGHN to give it to Christmas because "Christmas is gonna say that you did it anyway."

On or about February 21, 2002, Shamsud-din Ali delivered three checks to the Law Department, consisting of two new checks that Clark had given to VAUGHN on December 28, 2001, and a third check that Clark had given to VAUGHN in February 2002, to pay the balance owed by Bowman Properties and Snowden pursuant to the written settlement agreement.

On March 8, 2005, VAUGHN had a telephone conversation with Christmas, during which they discussed Shamsud-din Ali and the Bowman Properties tax collection matter as follows:

> JC: We did that to help Councilwoman Miller.
>
> SV: No you ain't do nothing to help us. They haven't done anything to help us. They have not done one thing to help us.
>
> JC: What about Bowman?
>
> SV: They haven't done one thing to help us.
>
> JC: (Laughs) what about Bowman?
>
> SV: Yeah, they help take away some of our campaign contribution.

    JC:    Yeah right, yeah.

    SV:    That was that was the only thing...

    JC:    Plus you got the Imam in the bag now.

    SV:    Oh, well you know I've always been cool with him and Sam Senior you know.

    JC:    Well now, now ...

    SV:    Um, but now, I guess now I'm on way cool, I'm on platinum level now.

    JC:    (UI)

    SV:    You know since he got all this, this, this massive freebie.

### Shamsud-din Ali Gives VAUGHN $2,000 of the Fraud Proceeds[1]

On March 26, 2002, the City of Philadelphia issued a check in the amount of $60,595.61 to KIFS, in payment of a commission for KIFS on the Bowman Properties tax collection. On April 3, 2002, Shamsud-din Ali deposited the check into KIFS' business checking account.

On April 18, 2002, Shamsud-din Ali and VAUGHN met at the KIFS business office at 7108 Germantown Avenue. During this meeting, VAUGHN told Ali he needed money. VAUGHN told Ali he needed "at least 54," meaning $5,400. Ali told VAUGHN he could get "two grand" for VAUGHN. Later that day, Shamsud-din Ali withdrew a portion of the fraud proceeds from the KIFS checking account by cashing a check payable to himself in the amount of $2,000. Shamsud-din Ali then left a voice-mail message for VAUGHN, telling him: "I can

---

[1] During the April 7, 2005 change of plea hearing, VAUGHN stated that he did not agree with the facts regarding the $2,000 payment. The government will present evidence to establish these facts at the sentencing hearing.

cover the first request you made. I already picked that up. But I'm looking for something else."

From approximately 3:25 p.m. until approximately 4:10 p.m. on or about April 18, 2002, Shamsud-din Ali and VAUGHN met at Ali's residence at 36 Latham Parkway, Elkins Park. Investigative agents conducted surveillance of the meeting. An agent observed VAUGHN carrying cash in his hand when he left the meeting.

## V. RECOMMENDATION

Over a hundred years ago, the journalist Lincoln Steffens wrote:

> All our municipal governments are more or less bad ....
> Philadelphia is simply the most corrupt and the most contented.

Steffens, L., Shame of the Cities, at 136 (1904). The defendant's offense conduct demonstrates corruption persists in Philadelphia. A sentence of imprisonment in this case is necessary to assure that contentment does not.

In the operation of his racketeering enterprise, Shamsud-din Ali exploited his influence with public officials to defraud the City of Philadelphia and its citizens. Ali obtained a public contract he was clearly not qualified to earn legitimately. Through fraud and false representations, Ali used that contract to pilfer $60,595 in public funds. The defendant assisted Shamsud-din Ali at every step of this scheme.

At the time, VAUGHN was the Chief of Staff for a member of City Council. As such, the defendant held a position of public trust. His duty was to use his office for the public good: to protect and serve the citizens of Philadelphia. Had VAUGHN wanted to serve his constituents and the citizens of Philadelphia, he could have delivered the Bowman Properties tax payments directly, and promptly, to the Law Department without any need for paying a 10% fee

to Ali. VAUGHN chose not to do so. Instead, VAUGHN worked for the benefit Shamsud-din Ali and himself. Under the pretext of providing a constituent service, VAUGHN assisted Shamsud-din Ali convert public funds to his personal use. VAUGHN withheld the tax payments until the co-conspirators obtained the contract for KIFS. VAUGHN then gave the checks to Ali so he could create the false appearance that KIFS had done the work and earned a fee under the contract. VAUGHN also misled Snowden and Clark about was he was doing with the tax payments. While Ali waited anxiously for his "massive freebie," VAUGHN and Christmas worked to obtain $60,595 in taxpayer funds for Ali, money for doing nothing. In exchange for his assistance, VAUGHN demanded and received a cut of the proceeds. VAUGHN sold his office, and sold out the citizens of Philadelphia, for $2,000.

Although VAUGHN and Christmas laughed about the "massive freebie" they orchestrated for Shamsud-din Ali, this fraud was hardly without cost to the citizens of Philadelphia. The City has closed swimming pools during the Summer because it could not afford to pay lifeguards. The public may well ask how many lifeguards the City could have hired for $60,595. In addition to the pecuniary loss, VAUGHN' offense conduct has done much to perpetuate the perception of Philadelphia as corrupt and content.

In determining the defendant's sentence, 18 U.S.C. § 3553(a)(2) requires that the Court consider, among others, the following factors:

> (2) the need for the sentence imposed -
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;
>>
>> (B) to afford adequate deterrence to criminal

      conduct;

      (C) to protect the public from further crimes of the defendant....

In the government's view, a sentence of imprisonment in accordance with the advisory Sentencing Guidelines, together with full restitution, is required to achieve the objectives of § 3553(a)(2). The defendant's sentence should send the clear message that the citizens of Philadelphia are not content with public corruption, and that any one contemplating misconduct similar to the defendant's will face punishment beyond the loss of the position of public trust that is abused. A sentence outside of the advisory Sentencing Guidelines range would be inconsistent with the objectives of § 3553(a)(2), particularly with respect to deterrence.[2]

Respectfully submitted

PATRICK L. MEEHAN
United States Attorney
Eastern District of Pennsylvania

ROBERT E. COURTNEY III
Deputy United States Attorney
Chief, Organized Crime Strike Force

DATE: _____

FRANK A. LABOR III
Assistant United States Attorney
Deputy Chief, Organized Crime Strike Force

---

[2] In October 2004, a jury convicted co-defendant Faridah Ali of 22 counts of fraud in connection with a scheme to divert $224,000 in public funds provided by the Community College of Philadelphia for adult education programs, to the personal benefit of Ali and her family. (This scheme is charged as Racketeering Act Eleven of Count One of the superseding indictment.) The advisory Sentencing Guidelines called for a term of imprisonment. Faridah Ali was sentenced to house arrest and probation, a sentence that generated a negative public reaction. See Philadelphia Dail News, April 12, 2005, at 16, 2005 WLNR 5676108.

_____
ANTHONY J. WZOREK
Assistant United States Attorney


_____
ZANE D. MEMEGER
Assistant United States Attorney

_____
ANTHONY J. WZOREK
Assistant United States Attorney


_____
ZANE D. MEMEGER
Assistant United States Attorney

CERTIFICATE OF SERVICE

FRANK A. LABOR III, an Assistant United States Attorney, certifies that a copy of The United States' Sentencing Memorandum was served upon counsel of record by facsimile and by United States mail, first class postage prepaid, on July 5, 2005, addressed as follows:

> MICHAEL F. GIAMPIETRO
> 239 S. Camac Street
> Philadelphia, PA 19107
> (215) 731-9887 (Fax)

_____
FRANK A. LABOR III
Assistant United States Attorney